Joseph R. Saveri (SBN 130064)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & MCCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000
azapala@cpmlegal.com

*Attorneys for Individual and Representative Plaintiff*
*John Arnerich d/b/a Container Outlet*

[additional counsel on signature block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN ARNERICH, an individual d/b/a CONTAINER OUTLET, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD.; VANGUARD GLOBAL TRAILER HOLDING, INC. a/k/a CIMC USA, INC.; COSCO SHIPPING DEVELOPMENT CO., LTD.; CHINA SHIPPING INVESTMENT CO., LTD.; SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD. a/k/a DONG FANG INTERNATIONAL CONTAINERS; FLORENS ASSET MANAGEMENT (USA) LTD.; CXIC GROUP CONTAINERS CO. LTD.; SINGAMAS CONTAINER HOLDINGS LTD.; PAN OCEAN CO., LTD.; PAN OCEAN (CHINA) CO., LTD.; PAN OCEAN CONTAINER SUPPLIES CO., LTD.; PAN OCEAN (AMERICA). INC.; GUANGDONG FUWA EQUIPMENT MANUFACTURING CO. LTD.; CHINA CONTAINER INDUSTRY ASSOCIATION; BOLIANG MAI; TIANHUA HUANG; YONGBO WAN; QIANMIN LI; YUQIANG ZHANG; SIONG SENG TEO; VICK NAM HING MA; DOES 1-10<br><br>Defendants. | Case No. ________________<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS


I. NATURE OF THE CASE ........ 1

II. THE PARTIES ........ 4

A. Plaintiff ........ 4

B. Defendants and Co-Conspirators ........ 4

1. CIMC Family ........ 5
2. COSCO Family ........ 6
3. CXIC Family ........ 7
4. Singamas Family ........ 8
5. Pan Ocean Family ........ 8
6. Guangdong Fuwa Family ........ 9
7. China Container Industry Association ........ 10
8. Individual Defendants ........ 10

C. Unnamed Co-Conspirator Doe Defendants and Agents ........ 16

III. JURISDICTION AND VENUE ........ 17

IV. FACTUAL ALLEGATIONS ........ 18

A. Background on Shipping Containers ........ 18

B. The Shipping Container Industry Is Highly Concentrated ........ 19

C. Defendants Engaged in a Conspiracy to Restrict the Output and Fix the Prices of Standard Dry Shipping Containers ........ 21

1. Defendants Hatched a Conspiracy to Restrict the Manufacturing of Standard Dry Shipping Containers ........ 21
2. Defendants Refined Their Operations Throughout the Conspiracy ........ 23
3. Defendants Exchanged Confidential Information Through In-Person Meetings, Emails, and Texts ........ 29
4. Defendants Actively Monitored Compliance with the Conspiracy and Punished Violators ........ 30
5. Defendants Halted the Growth of Smaller Competing Companies Not Involved in the Conspiracy ........ 31
6. Defendants Attempted to Expand the Conspiracy to Refrigerated Containers ........ 31
7. Defendants Knew the Conspiracy Violated Antitrust Laws and Took Steps to Conceal It ........ 32

D. Defendants' Conspiracy Caused a Supply Shortage and More than Doubled the Price of Standard Dry Shipping Containers ........ 33

E. Defendants Reaped Supracompetitive Monopoly Profits As a Result of the Cartel... 33

F. Certain Defendants Have Been Indicted by the United States Department of Justice for the Same Conduct ........ 34

G. The Various Corporate Families Acted as Single Enterprises with the Parent Companies Exercising Substantial Control and Direction Over Their Subsidiaries and Entire Corporate Families ........ 35

1. The Nature of the Conspiracy and the Standard Dry Shipping Containers Industry Generally Requires Companies to Operate as Single-Enterprises Rather Than Separate But Related Corporate Entities ........ 35
2. The Representatives of Defendants Who Attended Conspiratorial Meetings and Engaged In Collusive Conduct Did So on Behalf of the Entire Corporate Family ........ 36
3. The Collusive Agreement Was Directed from the Top of the Corporate Family Down ........ 37
4. Corporate Mergers and Overlapping Directors and Board Members ........ 37
5. Defendants Hold Themselves Out as Single, Integrated Enterprises ........ 40

V. ANTITRUST EFFECTS & DAMAGES ........ 41

VI. MARKET FACTORS THAT FACILITATED COLLUSION ........ 42

A. Relevant Product and Geographic Market ........ 42

B. Manufacturer Defendants Share Market Power ........ 43

1. High Market Concentration ........ 43
2. High Barriers to Entry ........ 44
3. Demand for Standard Dry Shipping Containers is Inelastic ........ 44

VII. CLASS ACTION ALLEGATIONS ........ 44

VIII. FRAUDULENT CONCEALMENT AND TOLLING ........ 47

IX. CAUSES OF ACTION ........ 48

X. PRAYER FOR RELIEF ........ 50

XI. DEMAND FOR TRIAL BY JURY ........ 51

Plaintiff John Arnerich, d/b/a Container Outlet, is an individual residing in California who owns and operates Container Outlet as a sole proprietorship. Plaintiff brings this class action on behalf of itself and a proposed class of direct purchasers of standard dry shipping containers (the "Class") against Defendants China International Marine Containers (Group) Co., Ltd.; Vanguard Global Trailer Holding, Inc. a/k/a CIMC USA, Inc.; COSCO Shipping Development Co., Ltd.; China Shipping Investment Co., Ltd.; Shanghai Universal Logistics Equipment Co., Ltd. a/k/a Dong Fang International Containers; Florens Asset Management (USA), Ltd.; CXIC Group Containers Co., Ltd.; Singamas Container Holdings Ltd.; Pan Ocean Co., Ltd.; Pan Ocean (China) Co., Ltd.; Pan Ocean Container Supplies Co., Ltd.; Pan Ocean (America), Inc.; Guangdong Fuwa Equipment Manufacturing Co., Ltd; China Container Industry Association; Boliang Mai; Tianhua Huang; Yongbo Wan; Qianmin Li; Yuqiang Zhang; Siong Seng Teo; Vick Nam Hing Ma; and Does 1-10 (together, "Defendants") to recover treble damages, injunctive relief, and any other relief as appropriate, based on violations of the Sherman Act.

## I. NATURE OF THE CASE

1. Millions of shipping containers travel across the world's oceans each year, transporting billions of dollars of goods destined for American businesses and households.

2. One of the main modes of transport for these good is by "standard dry shipping containers"—non-refrigerated ("dry") shipping containers with standardized dimensions ("Standard Dry Shipping Containers").

3. Since at least 2019, six companies have conspired and agreed to restrict the output and fix the prices of Standard Dry Shipping Containers.

4. As a result of the conspiracy, the prices of these containers roughly doubled between 2019 and 2021.

5. While the global supply chain was in crisis during the COVID-19 pandemic with shortages of all manner of goods, Defendants reaped enormous profits as a result of their scheme.

6. Beginning no later than November 14, 2019, and continuing to the present ("Class Period"), Defendants formed a price-fixing cartel and engaged in a direct agreement and

concerted scheme to artificially inflate the price of Standard Dry Shipping Containers by agreeing to restrict production and fix, peg and stabilize prices in the United States, despite high levels of demand and a worldwide shortage of these containers during the COVID-19 pandemic.

7. Defendants—the largest Standard Dry Shipping Container manufacturers in the world—together control approximately 95% of the world's production of Standard Dry Shipping Containers.

8. Rather than compete, Defendants formed a cartel and coordinated with one another to restrict production and artificially raise the price of Standard Dry Shipping Containers.

9. Defendants engaged in this illegal price-fixing conspiracy through a variety of means and instrumentalities, including in-person meetings, conversations, and electronic communications, in which Defendants agreed to exchange and did exchange non-public confidential information and made explicit agreements to limit output and fix, peg, and stabilize prices.

10. Defendants reduced some aspects of their cartel agreements and conspiratorial conduct to writing, memorializing the conspiracy and aspects of its implementation in a formal agreement.

11. Certain Defendants first agreed to limit the hours employees could work on factory production lines.

12. All Defendants then reached agreements and understandings to limit production through the imposition of a quota on the number of Standard Dry Shipping Containers Defendants produced.

13. During a time when demand for shipping containers was at a high due to a global supply chain crisis during the COVID-19 pandemic, Defendants agreed to restrict supply and capacity by, among other things, agreeing to limit production at existing factories and not build any new manufacturing facilities.

14. Defendants devised a system to monitor and enforce compliance with cartel agreements, by among other things, establishing a system of consensual video surveillance at their respective factories and places of business.

15. The agreements and understandings included a penalty system to be policed by cartel members including financial penalties for cheating on cartel agreements. Defendants engaged in this conduct despite knowing it was in violation of the antitrust laws of the United States. Defendants made efforts to conceal their cartel activity, including by offering pretextual and untrue explanations for their prices and other conduct.

16. Defendants also agreed and conspired to prevent and limit small factories outside the conspiracy from lowering prices, including engaging in punitive and predatory pricing schemes.

17. As a result of Defendants' cartel and other unlawful conspiratorial conduct, supply was limited while demand increased, with the purpose and effect that prices of Standard Dry Shipping Containers were increased and stabilized at supracompetitive levels.

18. Indeed, prices skyrocketed while Defendants reaped illegal supracompetitive monopoly profits.

19. The conduct was directed at United States markets and United States direct purchasers.

20. As intended, Defendants' cartel and other illegal anticompetitive conduct had a direct, intended and foreseeable effect on the United States, United States purchasers and, as a direct consequence, the prices paid for Standard Dry Shipping Containers in the United States.

21. As a direct and foreseeable consequence of Defendants' unlawful conspiracy, Plaintiff and Class members have paid supracompetitive prices for Standard Dry Shipping Containers.

22. One or more of the cartel participants, including Defendants in this case, was indicted for this unlawful conduct by a Grand Jury in the United States District Court for the Northern District of California. On May 19, 2026, a superseding indictment previously issued on January 22, 2026 (the "DOJ Indictment") was unsealed to the public.

23. Plaintiff, on behalf of itself and all other direct purchasers of Standard Dry Shipping Containers during the Class Period, brings this class action complaint against Defendants for violations of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3.

Plaintiff seeks damages under Section 4 of the Clayton Act and injunctive relief. 15 U.S.C. § 15. Plaintiff also seeks reasonable attorney's fees and costs. *Id*.

## II. THE PARTIES

### A. Plaintiff

24. **Plaintiff John Arnerich d/b/a Container Outlet** ("Container Outlet" or "Plaintiff") is an individual based in California who owns and operates Container Outlet as a sole proprietorship, with its principal place of business located in Aptos, California.

25. During the Class Period, Plaintiff purchased Standard Dry Shipping Containers directly from one or more Defendants. Plaintiff suffered antitrust injury and damages by paying artificially inflated prices as a direct result of the antitrust violations alleged herein.

### B. Defendants and Co-Conspirators

26. "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, assigns, agents, parents, wholly owned or controlled subsidiaries, affiliates, employees, officers, and directors.

27. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

28. Throughout the Class Period, Defendants regularly manufactured, marketed, sold, and imported Standard Dry Shipping Containers for delivery to purchasers in the United States, including Plaintiff and members of the proposed Class. Defendants sold substantial quantities of Standard Dry Shipping Containers in United States import commerce to customers residing in the United States, including shipping lines, container lessors, logistics providers, transportation companies, retailers, manufacturers, and other commercial purchasers. Defendants derived substantial revenue from the sales of Standard Dry Shipping Containers imported into and sold within the United States. Defendants knew and intended that the cartel and their price-fixing conduct had the purpose and effect of raising, fixing, pegging and stabilizing the prices of Standard Dry Shipping Containers in the United States. The intended and foreseeable consequence of this conduct was to raise prices paid by Plaintiff and the Class and to cause damage to them as a result.

29. Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, lawyers, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control, or transaction of the corporations' business or affairs, and for whom they are liable.

**1. CIMC Family**

30. **Defendant China International Marine Containers (Group) Co., Ltd. ("CIMC")** is a publicly traded company, organized and existing under the laws of the People's Republic of China with a principal place of business located at CIMC R&D Center, 2 Gangwan Avenue, Shekou, Nanshan District, Shenzhen, Guangdong 518067, China.

31. China International Marine Containers (Group) Co., Ltd is traded on the Shenzhen Stock Exchange (SZSE: 000039).

32. China International Marine Containers (Group) Co., Ltd is also traded on the Stock Exchange of Hong Kong (SEHK: 2039). During the relevant period, China International Marine Containers (Group) Co., Ltd. was engaged in the manufacture, marketing, distribution and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

33. **Defendant Vanguard Global Trailer Holding, Inc. a/k/a CIMC USA, Inc**. ("CIMC USA") is a company organized and existing under the laws of Delaware, with its principal place of business at 717 E Quarry Road, Monon, Indiana 47969, United States. CIMC USA is a subsidiary of China International Marine Containers (Group) Co., Ltd. During the relevant period, CIMC USA was engaged in the business of distributing and selling, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

34. CIMC and CIMC USA (collectively "CIMC Group") operate as a single consolidated entity with respect to the manufacture, marketing, distribution and sale of Standard Dry Shipping Containers in the United States and elsewhere by virtue of their wholly owned

parent-subsidiary relationship and the centralized management and control by the ultimate corporate parent and its wholly owned affiliate.

**2. COSCO Family**

35. **Defendant COSCO Shipping Development Co., Ltd. ("COSCO")** is a company organized and existing under the laws of the People's Republic of China with a principal place of business located at Building 1, Lane 1318, Shangcheng Road, Pudong New Area, Shanghai 200120, China.

36. COSCO "develops its main business centered around its core expertise in container manufacturing, shipping leasing and container leasing to achieve integrated development of industry, finance and investment underpinned by investment management." During the relevant period, COSCO was engaged in the manufacture, marketing, distribution and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

37. **Defendant China Shipping Investment Co., Ltd. ("China Shipping")** is a wholly owned subsidiary of COSCO Shipping Development Co., Ltd. with a principal place of business at Room 100, Floor 1, Building 6, No. 58 Rui Xing Road, Pudong New Area, Shanghai 201306, China.

38. China Shipping through its ownership of Shanghai Universal Logistics Equipment Co., Ltd., a/k/a Dong Fang International Containers is engaged in the manufacture, marketing, distribution and sale, including the sales of the price-fixed products of Standard Dry Shipping Containers to customers in the United States and elsewhere.

39. **Defendant Shanghai Universal Logistics Equipment Co., Ltd. ("Dong Fang")**, also known during the relevant period as Dong Fang International Containers, is a company organized and existing under the laws of the People's Republic of China with a principal place of business located at Building 4, Lane 1318, Shangcheng Road, Pudong New Area, Shanghai 200120, China.

40. Dong Fang owns, manages, and does business under the Dong Fang International Containers brand, also known as DF, DFIC, or Dong Fang.

41. Dong Fang is thus an indirect wholly owned subsidiary of COSCO Shipping Development Co., Ltd., the parent company. During the relevant period, Dong Fang was engaged in the manufacture, marketing, distribution and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

42. **Defendant Florens Asset Management (USA) Ltd. ("Florens USA")** is a company organized and existing under the laws of Delaware, with its principal place of business at 15600 John F. Kennedy Blvd. Suite 150, Houston, TX 77032, United States. Florens USA is a wholly owned subsidiary of Florens International, Ltd., COSCO Shipping Development (Hong Kong) Co., Limited, which is a wholly owned subsidiary of COSCO Shipping Development Co., Ltd. Florens USA is thus an indirect subsidiary of COSCO Shipping Development Co., Ltd., the parent company of Dong Fang. Florens USA is engaged in the business of distributing and selling, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

43. COSCO, China Shipping, Dong Fang, and Florens USA (collectively "COSCO Family") operate as a single consolidated entity with respect to the manufacture, marketing, distribution and sale of Standard Dry Shipping Containers in the United States and elsewhere by virtue of their wholly owned parent-subsidiary relationships and the centralized management and control by the ultimate corporate parent and its wholly owned affiliates.

**3. CXIC Family**

44. **Defendant CXIC Group Containers Co., Ltd. ("CXIC")** is a company organized and existing under the laws of the People's Republic of China with a principal place of business located at 11-12/F, Xincheng International Building, 88 Tong Jiang South Road, Changzhou, Jiangsu Province 213003, China.

45. During the relevant period, CXIC was engaged in the manufacture, marketing, distribution and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

### 4. Singamas Family

46. **Defendant Singamas Container Holdings, Ltd. ("Singamas")** is a publicly traded company, organized and existing under the laws of Hong Kong SAR, People's Republic of China with a principal place of business located at 15th Floor, Allied Kajima Building, No. 138 Gloucester Road, Wanchai, Hong Kong SAR, People's Republic of China.

47. Singamas Container Holdings, Ltd is publicly traded on the Hong Kong Stock Exchange (SEHK: 716).

48. During the relevant period, Singamas was engaged in the manufacture, marketing, distribution and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

### 5. Pan Ocean Family

49. **Defendant Pan Ocean Co., Ltd. ("Pan Ocean Co.")** is a publicly traded company, organized and existing under the laws of The Republic of Korea with a principal place of business located at Tower 8, 7, Jong-ro 5-gil Jongno-gu, Seoul 03157, Korea. Pan Ocean Co. is an affiliate of Harim Holdings, a Korean company with a principal place of business at 121 Jungang-ro, Iksan-si, Jeollabuk-do, Korea.

50. Pan Ocean Co Ltd is traded on the Korea Exchange (KRX: 028670).

51. During the relevant period, Pan Ocean Co. was engaged in the manufacture, marketing, distribution and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

52. **Defendant Pan Ocean (China) Co., Ltd**. **("Pan Ocean China")** is a wholly owned subsidiary of Pan Ocean Co. with its principal place of business located at Room 2004, West Bldg, Shanghai Zhong Rong Henguri International Plaza, NO.560 Zhongyang Road, Pudong District, Shanghai 200122, China.

53. During the relevant period, Pan Ocean China was engaged in the manufacture, marketing, distribution, and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

54. **Defendant Pan Ocean Container Supplies Co., Ltd. ("Pan Ocean Container Supplies")** is a company organized and existing under the laws of the People's Republic of China with a principal place of business in Room 108, No. 527, Jinghai Road, Economic Development Zone, Haiyan County, Zhejiang Province 314305, China.

55. During the relevant period, Pan Ocean Container Supplies was engaged in the manufacture, marketing, distribution, and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

56. **Defendant Pan Ocean (America), Inc. ("Pan Ocean America")** is a company organized and existing under the laws of Delaware, with its principal place of business at 55 Challenger Rd. Suite 500, Ridgefield Park, New Jersey 07660, United States.

57. Pan Ocean America is a wholly owned subsidiary of Pan Ocean Co., Ltd.

58. During the relevant period, Pan Ocean America was engaged in the manufacture, marketing, distribution, and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

59. Pan Ocean Co., Pan Ocean China, Pan Ocean Container Supplies and Pan Ocean America (collectively "Pan Ocean") operate as a single consolidated entity with respect to the manufacture, marketing, distribution and sale of Standard Dry Shipping Containers in the United States and elsewhere by virtue of their wholly owned parent-subsidiary relationships and the centralized management and control by the ultimate corporate parent and its wholly owned affiliates.

**6. Guangdong Fuwa Family**

60. **Defendant Guangdong Fuwa Equipment Manufacturing Co., Ltd ("Guangdong Fuwa")** is a company organized and existing under the laws of the People's Republic of China with a principal place of business located at No. 9 Gangkou Road, Leiliu Town, Shunde District, Foshan City, Guangdong Province 528322, China.

61. Guangdong Fuwa is a wholly owned subsidiary of Guangdong Fuwa Engineering Group Co., Ltd., a/k/a Fuwa Group.

62. Another subsidiary of Fuwa Group is Fuwa Container Technology Co., Ltd., which distributes Standard Dry Shipping Containers to over 100 industrial enterprises and international operators across more than 70 countries.

63. Guangdong Fuwa owns a factory called Guangdong Fuwa Equipment Manufacturing – Dry (CN), which is the company's manufacturing facility.

64. Guangdong Fuwa, Fuwa Group, and all affiliated subsidiaries of Fuwa Group operate as a single consolidated entity with respect to the manufacture, marketing, distribution and sale of Standard Dry Shipping Containers in the United States and elsewhere by virtue of their wholly owned parent-subsidiary relationships and the centralized management and control by the ultimate corporate parent and its wholly owned affiliates. During the relevant period, it was engaged in the manufacture, marketing, distribution, and sale, including sales of the price-fixed products of Standard Dry Shipping Containers, to customers in the United States.

### 7. China Container Industry Association

65. **Defendant China Container Industry Association ("CCIA")** is an entity with its headquarters and main offices located at Room 711A, Building A, Century Square, 99 Wangfujing Ave, Dongcheng District, Beijing 100006, China.

66. CCIA holds itself out as a trade association covering the entire industry chain for shipping containers that serves as an important social force in industry governance and a think tank for the industry's development.

67. Defendants belonged to CCIA and used CCIA as a method of promoting, facilitating, policing, monitoring, and concealing their conspiracy. Overt acts in furtherance of the conspiracy were committed at or in connection with CCIA functions and events.

### 8. Individual Defendants

#### i. Boliang Mai

68. **Defendant Boliang Mai** is a natural person. Plaintiff is informed and believes that Mai is a resident of the People's Republic of China.

69. Mai was employed by CIMC and served in various senior roles.

70. From August 2015 through July 2020, Mai served as President and Chief Executive Officer of CIMC.

71. From August 2020 through at least 2024, Mai served as Chairman and CEO of CIMC.

72. Mai personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint.

73. Mai actively participated in the formation, implementation, operation and concealment of the cartel and other illegal anticompetitive conduct set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

74. Mai committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

75. Pursuant to his employment agreement, Mai received express authority to direct and participate in the cartel and price-fixing cartel on behalf of CIMC, which was known by CIMC. Mai's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties and was undertaken pursuant to CIMC's implied authority. To those others who also participated in the cartel and other price-fixing activity, Mai carried and exchanged CIMC business cards, held himself out as a representative and agent of CIMC, and led others to believe he had authority to do so. CIMC retained the benefits of Mai's conduct.

**ii. Tianhua Huang**

76. **Defendant Tianhua Huang**, also known as T.H. Huang, is a natural person. Plaintiff is informed and believes that Huang is a resident of the People's Republic of China.

77. During the relevant period Huang was a Vice President at CIMC.

78. Huang personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

79. Huang committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

80. Pursuant to his employment agreement, Hunag received express authority to direct and participate in the cartel and price-fixing cartel on behalf of CIMC, which was known by CIMC. Huang's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties and was undertaken pursuant to CIMC's implied authority. With others who participated in the cartel and other price-fixing activity, Huang carried and exchanged CIMC business cards, held himself out as a representative and agent of CIMC, and led others to believe he had authority to do so. CIMC retained the benefits of Huang's conduct.

**iii. Yongbo Wan**

81. **Defendant Yongbo Wan** is a natural person. Plaintiff is informed and believes that Wan is a resident of the People's Republic of China.

82. During the relevant period, Wan was a General Manager of CIMC's Operation Management Center.

83. Wan personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

84. Wan actively participated in the formation, implementation, operation, concealment of the cartel, and other illegal anticompetitive conduct antitrust conspiracy set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

85. Wan committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

86. Pursuant to his employment agreement, Wan received express authority to direct and participate in the cartel and price-fixing cartel on behalf of CIMC, which was known by CIMC. Wan's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties and was undertaken pursuant to CIMC's implied authority. With others who participated in the cartel and other price-fixing activity, Wan carried and exchanged CIMC business cards, held himself out as a representative and agent of CIMC, and led others to believe he had authority to do so. CIMC retained the benefits of Wan's conduct.

### iv. Qianmin Li

87. **Defendant Qianmin Li** is a natural person. Plaintiff is informed and believes that Li is a resident of the People's Republic of China.

88. During the relevant period, Li was General Manager at Dong Fang.

89. Li personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

90. Li actively participated in the formation, implementation, operation and concealment of the cartel, and other illegal anticompetitive conduct antitrust conspiracy set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

91. Li committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

92. Pursuant to his employment agreement, Li received express authority to direct and participate in the cartel and price-fixing cartel on behalf of CIMC, which was known by CIMC. Li's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties and was undertaken pursuant to CIMC's implied authority. With others who participated in the cartel and other price-fixing activity, Li carried and exchanged CIMC business cards, held himself out as a representative and agent of CIMC, and led others to believe he had authority to do so. CIMC retained the benefits of Li's conduct.

### v. Yuqiang Zhang

93. **Defendant Yuqiang Zhang**, also known as James Zhang, is a natural person. Plaintiff is informed and believes that Zhang is a resident of the People's Republic of China.

94. During the relevant period, Zhang was Chief Executive Officer of CXIC.

95. Zhang personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

96. Zhang actively participated in the formation, implementation, operation and concealment of the cartel, and other illegal anticompetitive conduct antitrust conspiracy set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

97. Zhang committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

98. Pursuant to his employment agreement, Zhang Li received express authority to direct and participate in the cartel and price-fixing cartel on behalf of CXIC, which was known by CXIC. Zhang's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties and was undertaken pursuant to CXIC's implied authority. With others who participated in the cartel and other price-fixing activity, Zhang carried and exchanged CXIC business cards, held himself out as a representative and agent of CXIC, and led others to believe he had authority to do so. CXIC retained the benefits of Zhang's conduct.

**vi. Siong Seng Teo**

99. **Defendant Siong Seng Teo**, also known as S.S. Teo, is a natural person. Plaintiff is informed and believes that Teo is a resident of Singapore.

100. During the relevant period, Teo was CEO and Chairman of Singamas.

101. Teo personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

102. Teo actively participated in the formation, implementation, operation and concealment of the cartel, and other illegal anticompetitive conduct antitrust conspiracy set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

103. Teo committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

104. Pursuant to his employment agreement, Teo received express authority to direct and participate in the cartel and price-fixing cartel on behalf of Singamas, which was known by

Singamas. Teo's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties under Singamas's implied authority. To those others who also participated in the cartel and other price-fixing activity, Teo carried and exchanged Singamas business cards, held himself out as a representative and agent of Singamas, and led others to believe he had authority to do so. Singamas retained the benefits of Teo's conduct.

**vii. Vick Nam Hing Ma**

105. **Defendant Vick Nam Hing Ma**, also known as Vick Ma, is a natural person. Plaintiff is informed and believes that Ma is a resident of Hong Kong SAR, People's Republic of China.

106. During the relevant period, Ma was Marketing Director at Singamas.

107. Ma personally participated in, authorized or directed the price-fixing cartel, and other unlawful acts set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

108. Ma actively participated in the formation, implementation, operation and concealment of the cartel, and other illegal anticompetitive conduct antitrust conspiracy set forth in this Complaint, including acts which were directed at and intentionally and foreseeably caused harm in the United States and this District.

109. Ma committed overt acts in furtherance of the conspiracy and received payments and other personal remuneration and benefits from doing so.

110. Pursuant to his employment agreement, Ma received express authority to direct and participate in the cartel and price-fixing cartel on behalf of Singamas, which was known by Singamas. Ma's conduct in furtherance of the cartel activity was reasonably necessary to carry out his express duties under Singamas's implied authority. To those others who also participated in the cartel and other price-fixing activity, Ma carried and exchanged Singamas business cards, held himself out as a representative and agent of Singamas, and led others to believe he had authority to do so. Singamas retained the benefits of Ma's conduct.

111. Plaintiff is informed and believes that the individuals identified above and other current and former officers, directors, agents, employees or representatives of Defendants whose

identity Defendants have concealed or have not identified planned, developed, executed, enforced and concealed the price fixing cartel and other anticompetitive conduct alleged with the purpose and intent to raise, fix, peg, and stabilize the price of Standard Dry Shipping Containers in the United States and this District. These individuals did so with the actual, implied, and apparent authority of their employers, who obtained and retained the benefits of such conduct.

**C. Unnamed Co-Conspirator Doe Defendants and Agents**

112. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants in the offenses alleged and have performed acts and made statements in furtherance of the contract, combination, or conspiracy to raise prices of Standard Dry Shipping Containers. They did so with the actual, implied and apparent authority to act on behalf of such principals, who directed, were aware of and benefitted from these acts including obtaining illegal supracompetitive overcharges from the prices charged by cartel participants.

113. **Defendants Does 1-10** are persons or entities engaged in the business of manufacturing Standard Dry Shipping Containers and selling them to customers in the United States and elsewhere. Doe 3-10 personally or individually participated in, authorized, or directed the unlawful acts set forth in this Complaint, including acts directed at the United States and this District. Does 3-10 actively participated in the formation, implementation, operation and concealment of the illegal antitrust conspiracy set forth in this Complaint. Does 3-10 committed overt acts in furtherance of the conspiracy and received personal remuneration and benefits from doing so.

114. To the extent that discovery reveals there are subsidiaries, holding companies, or other entities affiliated with any Defendant that participated in, supported, advanced, and/or held assets resulting from the unlawful conduct alleged herein, Plaintiff reserves the right to name any such entities as Defendants.

## III. JURISDICTION AND VENUE

115. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 26, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

116. This Court also has subject matter jurisdiction pursuant to the 28 U.S.C. §§ 1331 and 1337(a). Plaintiff brings this action under Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

117. This Court has personal jurisdiction over each Defendant because Defendants purposefully directed their activities toward persons and entities in this District and throughout the United States by manufacturing, marketing, and selling substantial quantities of Standard Dry Shipping Containers into the stream of interstate commerce in the United States, including this District and availed themselves of the privilege of transacting business in the United States, including this District; have substantial contacts within the United States, including this District; have derived substantial revenue from interstate and international commerce; and are engaged in a conspiracy that is aimed at causing, and has caused harm to Plaintiff and members of the Class located, or operating in the United States, including this District. Defendants' conduct had a substantial, foreseeable, and direct effect on U.S. interstate commerce. Defendants understood and intended that Standard Dry Shipping Containers manufactured and sold under the conspiracy would be purchased by customers in the U.S. and used to transport goods into, out of, and throughout the U.S. The injuries suffered by Plaintiff and members of the Class arose directly from Defendants' domestic effects. The injuries suffered by Plaintiff and members of the Class were the intended and foreseeable consequence of Defendant's conduct.

118. Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391(b), (c), and (d) because Defendants transacted business, were found, or had agents in this District through the sale, distribution, and marketing of Standard Dry Shipping Containers, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

119. Venue is further proper because the conspiracy alleged herein has been the subject of parallel criminal proceedings brought in this District, including the indictment filed by the DOJ arising from the same unlawful conduct.

120. Defendants' conduct, as alleged herein, substantially and foreseeably affected interstate commerce in the United States, including in this District.

121. Defendants sell Standard Dry Shipping Containers in the continuous and uninterrupted flow of interstate commerce in the United States, including in this District.

## IV. FACTUAL ALLEGATIONS

### A. Background on Shipping Containers

122. Each year, billions of dollars' worth of goods are imported into and exported out of the United States and transported across the United States in millions of shipping containers.

123. There are different types of shipping containers, including non-refrigerated and refrigerated. The most common type of shipping container is a non-refrigerated shipping container, also known as a "dry" container or "dry box." Dry containers are general-purpose enclosed boxes made of rust-retardant steel.

124. Dry containers are sold in both standard and non-standard dimensions. The four standard dimensions for standardized dry shipping containers are: (1) 20-feet long at a shorter height; (2) 40-feet long at a shorter height; (3) 40-feet long at a taller height (called "high-cube"); and (4) 45-feet long at the high cube height.

125. Shipping lines, logistics and transportation services companies, and retailers purchase and use Standard Dry Shipping Containers to transport goods into, out of, and throughout the United States, spending billions of dollars per year on shipping containers. In addition to transporting goods on ships, Standard Dry Shipping Containers can be carried by trucks to transport goods across the nation's roads, highways and railways. Dry containers can be used in across a combination of intermodal transport mechanisms.

126. Standard Dry Shipping Containers are identifiable, discrete physical products that remain unchanged when Defendants sell them to direct purchasers like Plaintiff. Accordingly, Standard Dry Shipping Containers follow a traceable physical chain of distribution from

Defendants to Plaintiff and potential Class members. The overcharge on Standard Dry Shipping Containers can be traced through the chain of distribution to Plaintiff and potential Class members (i.e., from Defendants directly to direct purchasers).

**B. The Shipping Container Industry Is Highly Concentrated**

127. The shipping container manufacturing industry, including the market for Standard Dry Shipping Containers, is highly concentrated.

128. Together, Defendants manufacture roughly 95% of the world's supply of Standard Dry Shipping Containers. There are no significant US manufacturers of Standard Dry Shipping Containers. Almost all Standard Dry Shipping Containers are built overseas. Defendants control approximately the same shares of the United States Standard Dry Shipping Container market.

**Figure 1: Global Dry Container Production**




**Source:** Greg Miller, "How Three Chinese Companies Cornered Global Container Production: Drewry's John Fossey on why China is 'Unbeatable' at Building Boxes, American Shipper," May 24, 2021, available at https://www.freightwaves.com/news/how-three-chinese-companies-cornered-global-container-production.

129. Figure 1 above shows that the cartel's quota system held stable the Defendants' market shares throughout the quarters shown in the graph. Defendants had a combined market share that exceeded 95% in each quarter from 2019: Q4 through 2021: Q1, with Maersk and "Other" contributing the remaining share.

130. The 2020 market shares from Drewry's industry report on the Standard Dry Shipping Containers market are displayed in Figure 2 below. Defendants had a combined global market share of 98.0%. United States market shares were not substantially different.

**Figure 2: 2020 Global Market Shares**




**Source:** Drewry Research, "Container Equipment Forecaster: Quarterly Analysis of the Container Equipment Market," Quarter 1, 2023, downloadable from https://www.drewry.co.uk/maritime-research-products/container-census--leasing-and-equipment-forecaster-annual-subscription.

131. The 2021 market shares from Drewry's industry report on Standard Dry Shipping Containers market are displayed in Figure 3 below. Defendants had a combined global market share of 98.8%. United States market shares were not substantially different.

**Figure 3: 2021 Global Market Shares**



**Source:** Drewry Research, "Container Equipment Forecaster: Quarterly Analysis of the Container Equipment Market," Quarter 1, 2023, downloadable from https://www.drewry.co.uk/maritime-research-products/container-census--leasing-and-equipment-forecaster-annual-subscription.

132. Except for the year 2021, in which global shipping container production met or exceeded the listed global capacity, the Defendants had the available capacity to significantly expand production as they operated with utilizations of roughly 50% in 2019, 2020, and 2022 (and significantly lower utilization in 2023). Figure 4 below shows the manufacturing capacity and the production for the entire shipping container manufacturing industry from 2019 – 2026. While this graph includes containers other than Standard Dry Shipping Containers, the share of Standard Dry Shipping Containers is more than 90% of total shipping container production.

**Figure 4: Manufacturing Capacity and Production, 2019-2026 (Actuals for 2019-2022, Forecasts for 2023-2026)**




**Source:** Drewry Research, "Container Equipment Forecaster: Quarterly Analysis of the Container Equipment Market," Quarter 1, 2023, downloadable from https://www.drewry.co.uk/maritime-research-products/container-census--leasing-and-equipment-forecaster-annual-subscription.

## C. Defendants Engaged in a Conspiracy to Restrict the Output and Fix the Prices of Standard Dry Shipping Containers

### 1. Defendants Hatched a Conspiracy to Restrict the Manufacturing of Standard Dry Shipping Containers

133. Beginning no later than March 2019, several of the Defendants and their co-conspirators had discussed the formation of a cartel to control and stabilize the production and pricing of Standard Dry Shipping Containers, including those manufactured, marketed, distributed and sold to United States customers. Defendants discussed a scheme which included

an agreement and mutual understanding to restrict the output and fix the prices of Standard Dry Shipping Containers.

134. On or about November 14, 2019, executives from CIMC (Yongbo Wan and Tianhua Huang), Dong Fang (Qianmin Li), CXIC (Yuqiang Zhang), and an executive from Guangdong Fuwa met in person at CIMC's headquarters in Shenzhen to conduct cartel business. During this meeting, the executives reached a specific agreement to restrict their respective companies' manufacturing output of Standard Dry Shipping Containers by various means, including:

a. Setting production limits or quotas for Standard Dry Shipping Containers;

b. Limiting the number of shifts and hours per day for each production line for Standard Dry Shipping Containers;

c. Installing video surveillance devices at loading docks and other locations where dry containers were manufactured or transported to ensure that the companies did not exceed the agreed-upon limits;

d. Not building any new container manufacturing factories;

e. Establishing mechanisms to police the cartel and to detect cheating, including the creation of a fund (dubbed the Moon Gazing Fund) that included a mechanism to penalize financially any Defendant that cheated on the cartel agreements.

135. The purpose and effect of Defendants' cartel, including their agreement to restrict output, was to artificially raise, fix, peg, and stabilize the price of Standard Dry Shipping Containers. Defendants did so to restrict and eliminate competition and to reap the benefits of monopoly profits by overcharging United States customers.

136. No executives from Singamas or Pan Ocean Container Supplies appear to have been physically present at the November 14, 2019, meeting. However, the participants in the November 14, 2019, meeting knew, understood or planned that Singamas and Pan Ocean Container Supplies would join the cartel. Singamas and Pan Ocean Container Supplies did so shortly thereafter.

137. The companies planned to conduct in-person cartel meetings on or around November 21, 2019. Plaintiff is informed and believes that cartel participants communicated by telephone, email or by text message to coordinate these meetings. On or about November 21, 2019, an executive from Singamas ("Singamas Executive 1") emailed another Singamas executive, Siong Seng Teo, reporting that Qianmin Li of Dong Fang had invited "all the (6) factories" to meet on December 3, 2019, at Dong Fang's office in Shanghai. The Singamas Executive 1 stated that "[t]he meeting agenda will be production capacity and healthy development of container industry, etc." "Healthy development of container industry" was code for an illegal price fixing cartel.

138. According to another email from an unidentified Singamas executive to Siong Seng Teo, "[r]epresentatives from 6 factories attended the meeting at Dong Fang Shanghai office [on December 3, 2019." That Singamas executive reported to Teo that Defendants discussed (i) limiting the number of shifts and hours that each production line for Standard Dry Shipping Containers could run per day; (ii) building "[n]o new production line;" (iii) installing "CCTV [. . . ] in all production lines in March 2020;" (iv) having each factory submit a deposit that would be deducted "[i]f any factory break [*sic*] the agreement."

139. Cartel participants were aware that their conduct was illegal and took steps to conceal it. The executive also reported to Teo that "[d]uring the meeting, I have reminded them not to be high profile since it might violate the Monopoly Law or being accused of price manipulation by our customers."

140. Defendants memorialized aspects of the particular understanding they reached in a written agreement, which they called the "Shenzhen Moon Gazing Equity Investment Fund" (the "Moon Gazing Fund" contract). CIMC circulated a draft to the other Defendants on or around February 2020. In furtherance of the cartel, the Defendants then held a ceremony in or around March 2020, where they executed the Moon Gazing Fund contract.

**2. Defendants Refined Their Operations Throughout the Conspiracy**

141. The Defendants refined cartel operations over time. For instance, by September 2020, Defendants had reached a specific understanding regarding how many Standard Dry

Shipping Containers each would manufacture for specific customers, whom the Defendants referred to as "mainstream customers" or "mainstream clients." These customers included major U.S.-based container lessors, shipping lines, and logistics companies, in addition to container lessors, shipping lines, and logistics companies based in Europe, the People's Republic of China, and elsewhere.

142. While Defendants had first reached an understanding regarding limiting the hours worked on production lines where Standard Dry Shipping Containers were manufactured, Defendants reached even more specific agreements capping the total volume of containers the companies produced across all customers and to limit production for certain customers.

143. On or about July 7, 2022, Singamas executives, including Teo, met again to discuss Defendants' measures to restrict manufacturing output of Standard Dry Shipping Containers. In that meeting, Teo stated that Singamas "would prefer a monthly total quota instead" of "the restriction on working hours per day." Beginning at that time and continuing until at least November 2023, Defendants agreed to cap the total cargo volume of containers that Defendants produced. On or about November 20, 2023, for example, Vick Ma of Singamas co-presented to Teo the conspiracy's "Total Allowable capacity" and "allowable quota" for production-organized by each company conspirator and its factory lines. Such information is proprietary and highly confidential. Exchanging this information, in and of itself, would have been against each cartel participant's individual self-interest and is inherently anticompetitive. These presentations represent more than an agreement to exchange such highly confidential proprietary information. The presentation memorializes the agreements and understandings reached by cartel participants, particularly those concerning production capacity. The image below is part of that presentation:

**Figure 5: DOJ Indictment Quota Table**

• Dec allowable quota - 50 hours= 125,000Teus for whole industry

| | | –boo –:□y | sap 2022 to Aor202, | Ma.y202 | JuntoAug 202, | sop 202: | oct202, | Nov2023 | subtotal ofNov | ->of Nov2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | oxat Hours: | 1SC | | 50 | ••, | J( | 2I | | |
| CIMC | 1&2 5"1-0(AB5° JE) | 2.20 | :>:,,000 | 0 | 11.:>0( | 6,B:O | 6,600 | 4== =0 | | |
| | 3 £i-i-A | 18 | :2,700 | C | 900 | 720 | | 360 | | |
| | 4 □□-B | 80 | 12,000 | 0 | 4,000 | 3.: 00 | 2,4□□ | 1,600 | | |
| | 5 :tIIII, ZCMCIBUNE) | 56 | V= | 0 | 2.8.:0 | 22:'1. | 1,68: | 1,1:2J | | |
| | 6 -r=:.JJ: NCLE (A.LINE) | 110 | 1□□= | 0 | 5,500 | 4,-400 | 3,3'JC | 2□00 | | |
| | 71□...U SCBC(BLINE) | ,8 | 11,70"' | 0 | 3,9:>U | 3,1:%) | 2,.st.U | 1,560 | | |
| | 8 AL.I..1 SYLE(BLINI:I | 106 | 15,901 | c | S,S.:>( | 4,Z.:O | 3,180 | 2,1:20 | :22,1&0 | 43"' |
| | 9.\::t',C | 110 | 15,L/JI | C | 5500 | 4A00 | 3,3'JC | 2,2<>( | | |
| | 10 :t.'0B | 102 | 15.50C | c | 5;100 | 4·>80 | 3,060 | 20<:I | | |
| | '11 L:L:t:L QDCM (B LINE) | 90 | 1"-SOC | < | 4,500 | 3,600 | 2,700 | 1,300 | | |
| | 12 □□TJCG(BI..INE\ | ;-c | 10,SOC | C | 3,50:> | 2-8:X, | 2HX> | 1.AOO | | |
| | 1Si1'sI'"RVCiBUNE) | 34 | 5,100 | 0 | 1700 | 1,3;60 | 1,0Z> | 680 | | |
| | 14 A.'14 DCMCIB LINE) | 34 | 51·DC | | 1,700 | 1,360 | 1.0Z> | 600 | | |
| DFIC | 1sΓ·JH | 94 | 14,·100 | C | 4,700 | 3,750 | 2,820 | '1;880 | | |
| | '16 E:lt."!2, OFOT (BLINE) | 72 | 10,R_"f" | 0 | S,600 | 2.880 | 2,1'60 | ·1,440 | | |
| | 17 t.\"IJII CFJZ (S LINE) | 94 | 1,L'IOC | C | 4,700 | 3.7-® | 2,s.ro | ·1,aeo | | |
| | 18=:;1': | 100 | 15,000 | 0 | 5,000 | 4,000 | S.000 | 2,000 | '12,960.00 | 25=: |
| | 19 B1F.f·t· | 104 | 15601 | | 5.200 | 4160 | 3,120 | 2,080 | | |
| | z:>I.□::F.:t,.t5 | 00 | '1"'00 | | 4.000 | 3.200 | 2.400 | ·1,600 | | |
| | 21 iaT.:;"Ui DFLYG(BLINE) | 104 | 1S.60I: | c | 5200 | 4160 | 312:I | 2.0&I | | |
| CXIC | 7-::'-%! TXIC(BLINE) | ;-c | 10,0:::,v | c | S,SOO | 2,8,00 | 2.100 | 1,"OO | | |
| | 23IJ1i-SL QXIC(SLINE) | 72 | 10,00 ... | c | S,600 | 2,880 | 2,160 | 1"40 | | |
| | 24 /'Iii! | 104 | 15,60C | C | 5,2:00 | 4,160 | 3,1:20 | 2;080 | 8,120 | 16°A |
| | 25 □:'JXIC(AUNE) | 60 | 9,000 | C | 3,000 | 2,400 | 1,8<X | 1,II<XI | | |
| | 26 T::.h | 100 | 15,COC | C | 5,000 | 4:::00 | 3,000 | 2,000 | | |
| 51NGAMA5 | :ul-,,W | 68 | 10,2:IC | 0 | | 2,7:20 | 2:□ | 1,360 | | |
| | | 56 | 8,400 | C | ·10,000 | 2.240 | 1,6"0 | 1,120 | 2,"80 | 5• |
| [redacted] | =-JJ(?T | 90 | 13,500 | ( | 4,300 | 3,600 | 2,700 | 1,800 | | |
| [redacted] | | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | S,60-0 | 7□ |
| | :: Tola!AllowalJI&capacity | | 38-4.90( | c | 132.100 | 102.640 | 76,98( | 51.32( | 5 132 0 | 100"/ |
| | I Tobi 2022 to Nol/202.J') | | | | 747,940 | | | | | |

10,000 Speci□1g□n.eda1.0.n-:e ?odLCe TWN Ctder-s.only(o"' 9in□ 6,800 TEL.o)

**Source:** DOJ Indictment

The DOJ table redacts certain participants. FUWA is Co-Conspirator A and Pan Ocean Container Supplies is Co-Conspirator B.

144. Ma's presentation to Teo referenced the term "TEUs." TEU is an abbreviation for Twenty-foot Equivalent Unit and is the standard unit of measurement for quantifying cargo capacity in the shipping and logistics industry.

145. The quota table reported the total production hours for that period which were set by operation of the cartel and by agreement of cartel participants and reflected the agreement to restrict and limit production. For example, in the eight months from September 2022 – April 2023, there was a total of 150 hours of production. May 2023 had 0 hours of production. In the three-month period June – August 2023, there was a total of 50 hours of production. September 2023 had 40 hours of production, October 2023 had 30 hours of production, and November 2023 had 20 hours of production. The title of the quota table indicates that the allowable quota for December 2023 is 50 hours of production. Production hours were identified for all Defendants as cartel participants had agreed. The production hours are multiplied by the per-hour capacity

(measured in TEUs) to calculate the total production (in TEUs) for each factory line, the total production for each Defendant, and the total production for all Defendants combined.

146. In so doing, the cartel set production quotas and allocated and stabilized market shares at historic levels, thereby eliminating competition. The relative market shares across the six conspirators generally did not change month to month, as shown in Table 1 and Figure 6 below.

**Table 1. 2023 Annual Global Production (TEUs)**

| Companies | TEUs | Market Share |
|---|---|---|
| CIMC | 293,620 | 40.8% |
| Dong Fang | 171,720 | 23.9% |
| CXIC | 107,590 | 14.9% |
| Singamas | 36,660 | 5.1% |
| Fuwa | 47,700 | 6.6% |
| Pan Ocean | 26,500 | 3.7% |
| Other | 35,989 | 5.0% |
| **Total** | **719,779** | **100.0%** |

**Source:** DOJ Indictment

**Figure 6: 2023 Global Market Shares**




**Source:** DOJ Indictment

147. With the agreement to maintain market shares, Defendants each decreased their total production, thereby decreasing supply and forcing increased prices. The total production in the Standard Dry Shipping Container market in 2023 was 720,000 TEUs. The total production in 2020 was 3.1 million TEUs. As shown in Table 1 above, the combined market share of the Big 3 companies (CIMC, Dong Fang, and CXIC) was 79.6% in 2023. Their combined share was 82% in 2021:Q1. This reflects stable market shares and decreasing total output, a hallmark of cartel behavior.

148. The total production (in TEUs) and market shares are displayed graphically in Figures 7 and 8 below.

**Figure 7: 2023 Annual Global Production (TEUs)**




**Source:** DOJ Indictment

**Figure 8. 2020-2022 Annual Global Production, in TEUs**




**Source:** Drewry Research, "Container Equipment Forecaster: Quarterly Analysis of the Container Equipment Market," Quarter 1, 2023, downloadable from https://www.drewry.co.uk/maritime-research-products/container-census--leasing-and-equipment-forecaster-annual-subscription.

Total production in the Standard Dry Shipping Container market was 2.76 million TEUs in 2020, 6.64 million TEUs in 2021, and 3.45 million TEUs in 2022.

149. An industry report from the first quarter of 2023 shows total production of Standard Dry Shipping Containers by manufacturer for the years 2020 – 2022. The information from the industry report confirms that the combined market share of the Defendants exceeded 95% throughout the conspiracy, and that the relative market shares among the Defendants remained stable throughout the conspiracy.

150. The success of Defendants' cartel to restrict output and fix prices reduced the supply of Standard Dry Shipping Containers available to U.S. purchasers and increased the prices paid for such containers in the United States. These effects followed as the direct, immediate and foreseeable consequence of Defendants' output restrictions and price-fixing conduct. Defendants' other explanations for these developments were pretextual and were intended to conceal the existence of the cartel and the specific agreements and understanding reached by cartel participants.

**3. Defendants Exchanged Confidential Information Through In-Person Meetings, Emails, and Texts**

151. In addition to the in-person meetings and emails described above, Defendants and their co-conspirators used additional instruments of interstate and international communication to exchange information and promote, facilitate, police, and monitor their agreement to restrict manufacturing output of Standard Dry Shipping Containers.

152. For example, Defendants and their co-conspirators created a text message group chat in the application WeChat and a list of contacts at each Defendant company. Yongbo Wan of CIMC, Tianhua Huang of CIMC, Qianmin Li of Dong Fang, and Yuqiang Zhang of CXIC were employees listed as contacts for their respective companies. Wan, Huang, Li and Zhang held themselves out as representatives for their employers and the corporate families and affiliated entities they served.

153. In-person meetings continued throughout the conspiracy. One such meeting took place in or around February 2023 between Vick Ma of Singamas, Tianhua Huang and Yongbo Wan of CIMC, Qianmin Li of Dong Fang, and Yuqiang Zhang of CXIC.

154. Another in-person meeting took place in or around March 2024 at CIMC's Shenzhen headquarters. Boliang Mai, Yongbo Wan, and Tianhua Huang of CIMC, an executive from Dong Fang, Yuqiang Zhang of CXIC, Vick Ma of Singamas, and two executives from Guangdong Fuwa met to discuss output "control mechanisms."

155. Defendants also had the opportunity to meet and discuss aspects of their conspiracy through their participation in trade associations, including the CCIA.

156. CIMC and CIMC representatives took a leadership role in the CCIA, in particular the use of CCIA to further cartel agreements and understanding.

157. Huang of CIMC served as its President. Wan served as Vice President. Mai served as Honorary President of the CCIA. Other Defendants are believed to have participated in the CCIA.

### 4. Defendants Actively Monitored Compliance with the Conspiracy and Punished Violators

158. Defendants took elaborate invasive measures to police the cartel.

159. Defendants installed video-surveillance systems at their factories to ensure compliance with agreed-upon output restrictions and to identify and eliminate cheating on the cartel. Cartel members installed no less than 87 cameras at 49 different container production lines in Defendants' factories.

160. Cartel members had access to the video feeds from these cameras and were able to monitor the conduct of other cartel members. But for the cartel, and the agreements to implement the cartel, such monitoring devices would not have been installed, and other companies would not have received data from them. Defendants and their co-conspirators used the video-surveillance systems to monitor compliance with their output restriction operation. For example, on or about June 2021, Wan (CIMC) emailed Huang (CIMC) an audit of the company conspirators' production lines, including screenshots from the video surveillance footage. Below is a screenshot of surveillance footage from Guangdong Fuwa's factory that was included in the audit:

**Figure 9**



### 5. Defendants Halted the Growth of Smaller Competing Companies Not Involved in the Conspiracy

161. Defendants also worked to foreclose and eliminate competition from market entrants and smaller Standard Dry Shipping Container manufacturers who were not part of the cartel. Beginning no later than 2020 and continuing periodically throughout the cartel, cartel members discussed the threat posed by new market entrants and conspired to exclude or eliminate them from the market. Among other things, new market entrants would increase supply and would not be bound by cartel agreements or understandings.

162. On or around August 7 and 10, 2023, cartel members discussed waging "war" against smaller manufacturers who were not members of the cartel. This was not competition, but instead represented cartel members working together to preserve their market allocation agreements and restrict supply. The conspirators agreed to act together "to strike back by sentencing [sic] the price war against these small factories. [. . .] The aim is to signalize these small factories not to grab the orders in low price [sic] which violated the effort to stabilize the price[.]" The intent of this conduct was punitive and predatory. This was a form of punishment to companies that threatened the cartel with competition.

### 6. Defendants Attempted to Expand the Conspiracy to Refrigerated Containers

163. Following Defendants success in forming a cartel directed at Standard Dry Shipping Containers, cartel members sought to expand the cartel to other products, including refrigerated shipping containers, also known in the industry and referred to hereinafter as "reefers."

164. On or about May 15, 2020, Huang (CIMC) emailed the CEO of a competing reefer manufacturer. Huang confirmed the existence of the cartel and that certain agreements and understanding had been achieved. He wrote that manufacturers of Standard Dry Shipping Containers had "reached a consensus and established industry self-discipline actions" to address, among other things, "overcapacity." Huang sought to extend the scope of the cartel to "all standard reefer manufacturers, like the standard dry box manufacturers, shall negotiate and

communicate with each other, act together, follow the dry box practice, mainly including, (a) No capacity increase, (b) All standard reefer manufacturers run one shift only."

165. The CEO from the competing reefer manufacturer declined the invitation, writing that "any such coordination is strictly forbidden by the compliance policies" of his company. Nonetheless, Huang and other cartel members continued to participate in the cartel.

**7. Defendants Knew the Conspiracy Violated Antitrust Laws and Took Steps to Conceal It**

166. Defendants knew their agreement violated antitrust laws and took steps to conceal it. Indeed, Defendants and their co-conspirators conducted their cartel activity in-person to "avoid the suspicion of industry monopoly[.]" Defendants actively engaged in steps to conceal the cartel, the agreements and understandings reached, and their efforts to police their conduct.

167. In or around December 2019, Teo wrote that "we also need to keep low key."

168. Cartel activity was reported to the members of the boards of directors of cartel participants. Having reviewed reports from cartel meetings, a board member of Singamas replied that "[t]he discussion appeared to be anti-competition to me [....] I feel very uneasy reading your report. May be [sic] we should delete this string of emails after reading?" Teo answered: "Yes I feel the same, told [Singamas Executive 1] and [another Singamas executive] at am call."

169. In or around October 2021, while preparing a presentation to Singamas's board of directors, Singamas executives exchanged a draft slide deck for the meeting. The draft slides mentioned a "[m]anufacturing sector official and unofficial association/alliance." One executive told the other, "I am generally fine with your ppt except on page 3, please delete 'alliance' as it is quite sensitive under anti-trust law."

170. In or around March 2022, a Singamas executive commented on a draft slide deck for Siong Seng Teo's upcoming presentation to investors of Singamas's 2021 annual results. The executive suggested to Teo and other Singamas executives that, for the topic of "market discipline, it is better not to put on the slide due to anti-trust issue." Teo replied: "Appreciate, I will make some amendments to the slide (take out come [sic] words) and revert tomorrow am."

171. In or around March 2023, Vick Ma prepared minutes of a March 2023 meeting between himself, Teo, and other Singamas executives. At that meeting, a Singamas executive "raised concern about the Anti-Trust violation" and was concerned that "there may be a risk of being sued by clients."

**D. Defendants' Conspiracy Caused a Supply Shortage and More than Doubled the Price of Standard Dry Shipping Containers**

172. The cartel was effective in reducing supply and raising, fixing, puffing, and stabilizing prices. Cartel members restricted output through their scheme.

173. Defendants knew and intended their agreements and understandings to restrict output would lead to higher supracompetitive prices for Standard Dry Shipping Containers. For instance, on or about December 13, 2019, the chairman of CIMC Boliang Mai sent an email to his subordinates Tianhua Huang, Yongbo Wan, and another executive from CIMC that predicted that the price of 20-foot Standard Dry Shipping Containers would rise to more than $2,000. Mai warned the recipients not to forward his email.

174. Defendants were able to achieve their goal of raising, fixing, pegging, and stabilizing prices. During the conspiracy, the price of most types of Standard Dry Shipping Containers more than doubled. From 2019 to 2021, the price of a standard dry 20-foot container more than doubled from roughly $1,600 to over $3,500. During this same period, the price of a standard dry 40-foot container more than doubled from roughly $2,800 to over $5,900, and the price of a standard dry 40-foot-high cube container doubled from roughly $3,000 to over $6,000. From 2019 to 2022, the price of a standard dry 45-foot-high cube container increased from roughly $4,100 to over $5,730. During that period demand increased due to the COVID-19 pandemic. But for Defendants' supply restrictions and other cartel behavior, supply would have increased, new market entry would have occurred, and lower prices would have prevailed.

**E. Defendants Reaped Supracompetitive Monopoly Profits As a Result of the Cartel.**

175. Defendants' profits skyrocketed as a result of their high supracompetitive prices for Standard Dry Shipping Containers. For example, the profits of CIMC's container

manufacturing business increased approximately 100 times between 2019 and 2021. CIMC's profits rose from CN¥137 million CN¥ in 2019 (about $19.8 million) to CN¥1.99 billion CN¥ in 2020 (about $288 million) to CN¥11.3 billion CN¥ (about $1.75 billion) in 2021. Singamas's net income went from a loss of about $110 million in 2019 to profits of about $4.6 million in 2020 and about $186.8 million in 2021.

176. Defendants remarked on the industry's profitability during the conspiracy. In or around May 2020, Dong Fang wrote to CIMC and praised how the agreement on the production of Standard Dry Shipping Containers had restored profitability to the industry.

177. In or around April 2021, an executive from Singamas emailed Siong Seng Teo of Singamas to highlight the positive profit outlook for the container manufacturing industry. The Singamas executive reported to Teo that given "strong demand, container shortage, plus strict discipline in pricing and working hours, I believe all container factories have significant increase in sales revenue and profit." And in or around January 2023, Singamas executives wrote to each other that the entire industry profited from the conspiracy in 2021 and 2022.

178. The extraordinary profits from Standard Dry Shipping Containers during the Class Period resulted from illegal cartel agreements, not competition or the ordinary operation of supply and demand. During the Class Period, Plaintiff and members of the proposed Class directly purchased Standard Dry Shipping Containers from Defendants and paid artificially inflated and supracompetitive prices because of Defendants' unlawful actions. But for Defendants' illegal conduct, Plaintiff and members of the Class would have paid lower prices and would have had the benefit of increased supply

### F. Certain Defendants Have Been Indicted by the United States Department of Justice for the Same Conduct

179. Certain Defendants have been under investigation by the United States Department of Justice for the same conduct to restrict output and artificially raise the price of Standard Dry Shipping Containers as alleged in this complaint.

180. In October 2025, a Grand Jury in the United States District Court for the District of Northern California indicted certain Defendants and certain executives employed by

Defendants, under seal, on felony charges of output restriction and price fixing in violation of the Sherman Act. A Grand Jury before the same court issued a superseding indictment on January 22, 2026, which was unsealed by the court on May 19, 2026.

### G. The Various Corporate Families Acted as Single Enterprises with the Parent Companies Exercising Substantial Control and Direction Over Their Subsidiaries and Entire Corporate Families

181. When Plaintiff refers to a corporate family or companies within a corporate family by a single name in its allegations of Defendants' participation in the conspiracy alleged in this Complaint, Plaintiff is alleging that one or more employees or agents of entities within the particular Defendant's corporate family engaged in conspiratorial meetings on behalf of every company in that family. This is because each corporate parent in a respective corporate family exercised substantial control over the subsidiary's functions, employees and decision-making processes. Each corporate parent alleged herein has directed, controlled and/or encouraged its subsidiaries to engage in the anticompetitive conduct that is the subject of this Complaint.

#### 1. The Nature of the Conspiracy and the Standard Dry Shipping Containers Industry Generally Requires Companies to Operate as Single-Enterprises Rather Than Separate But Related Corporate Entities

182. Each of the corporate families alleged herein operates not as separate corporate entities but as a single enterprise, thereby making the parents liable for their controlled subsidiaries' conduct and vice versa. Indeed, as the following allegations demonstrate, each corporate family holds itself out as a single enterprise to the public. Each of the parent companies alleged herein operates a hierarchical corporate structure wherein it treats subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent. Each corporate parent alleged herein also coordinates and manages meetings between the managers from each of the different subsidiaries to facilitate an integrated enterprise and to link the various supply-chain routes. The parent companies dominate and control the finances, policies, and business practices of their various subsidiaries.

183. By virtue of their integrated enterprises, each Defendant individually entered into the conspiracy alleged herein on behalf of, and reported these meetings and discussions to, their

respective corporate families or parent. Consequently, each Defendant charged the fixed prices and/or had representatives at the meetings that had the authority to act on the subsidiary's and/or parent's behalf.

184. Given the nature of the industry, the price-fixing conspiracy alleged herein would not have worked unless there was involvement from both the parent company and its subsidiaries. The affected trade at issue in this Complaint is transnational and requires an integrated single enterprise for the purpose of shipping goods overseas. The price increases could only be imposed and collected with the cooperation of the entire corporate family because the increases were imposed *and* collected at origin and destination.

185. The Defendants named in this Complaint are part of vertically-integrated operations that provide these products not only in the United States but across the world. Each of these Defendants controls its corporate affiliates, and together with its affiliates, holds itself out to Plaintiff, other Class members and the rest of the world as one unified, global company, capable of instant communication among affiliates and the seamless provision of products, and services everywhere they operate

**2. The Representatives of Defendants Who Attended Conspiratorial Meetings and Engaged In Collusive Conduct Did So on Behalf of the Entire Corporate Family**

186. In many instances of meetings and communications between and among the Defendants in furtherance of the conspiracy alleged here, Plaintiff alleges that the specific entity that was represented in a particular meeting or communication acted on behalf of its corporate family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. Notwithstanding Plaintiff's lack of knowledge of such details at this stage, Plaintiff has alleged very specific information in this Complaint of the identity of which Defendants participated in such meetings and discussions on behalf of their respective corporate families. As a result, entire corporate families were represented in meetings and discussions by their agents and were parties to the agreements reached in them.

187. When representatives from these companies met and made collusive agreements at and through trade association events and other events and meetings, they did so on behalf of their entire corporate family. The representatives from these companies did not distinguish between allegedly separate corporate subsidiaries. They entered agreements, for example, on behalf of "Dong Fang." Defendants knew the individuals at the meetings represented their entire respective corporate family; otherwise, the Defendants would not have entered into the illegal agreements because the conspiracy alleged herein would not have functioned properly with less than the agreement from the entire corporate family.

188. For example, Defendant Huang served as the Vice President of CIMC, the chairman of various CIMC subsidiaries, and the director of CCIA, which held itself out as an entity advocating for the entire industry. Individuals from different COSCO entities had roles with different entities within the COSCO corporate family. *See generally infra* § IV.G.4.

**3. The Collusive Agreement Was Directed from the Top of the Corporate Family Down**

189. In addition to Defendants holding themselves out as unified, global companies rather than separate corporate entities, certain Defendants' high-level executives met personally and established the collusive arrangement. This collusive arrangement set the "tone at the top" of the particular corporate family all the way down to its affiliates and subsidiaries.

190. After the representatives from each corporate family engaged in collusive conduct, they would notify their counterparts, superiors and/or underlings across the entire corporate family of the price increases.

**4. Corporate Mergers and Overlapping Directors and Board Members**

191. In 2016, COSCO Group and China Shipping Group merged and combined. The resulting corporate restructuring included the combination of the COSCO Group subsidiary COSCO Container Lines and the China Shipping Group subsidiary China Shipping Container Lines (CSCL) under the new entity name COSCO Shipping Development Co., Ltd.

192. With the merger, the leasing subsidiaries, Florens Container Holdings Limited and Dong Fang International Investment, were also merged and combined into a single entity named Florens International Limited ("FIL") a/k/a Florens Asset Management Company, Ltd.[1]

193. FIL is wholly owned by COSCO Shipping Development Co., Ltd.[2] COSCO acknowledged the DOJ's investigation of Dong Fang in this matter and voluntarily disclosed that it was closely monitoring the matter.[3]

194. The new entity, COSCO Shipping Development Co., Ltd., succeeded the rights, duties and liabilities of the predecessor companies, including the liabilities for the claims arising from this lawsuit.

195. As a result of the merger, effective May 3, 2016, Florens Container Holdings Limited and Dong Fang International Investment Limited jointly announced:

> Florens Group and Dong Fang Group will formally commence full scale business and operations integration. We are confident that through such integration, the combined Group under Florens brand name shall become one of the world's leading international container leasing and trading service provider and shall greatly enhance our ability to provide high quality services to our customers at more competitive pricings. We shall be able to meet more rigorous customer service standards and requirements and create more business opportunities for our suppliers. In addition, our employees will be offered with more diversified career development opportunities.

A notice to shareholders dated April 28, 2016, titled "Integration of Container Leasing and Trading Businesses and Operations between Corporate Groups of Florens Container Holdings Limited and Dong Fang International Investment Limited" contained a signature block by both Florens Container Holdings Limited and Dong Fang International Investment Limited.[4]

---

[1] COSCO Shipping Ports 2016 Annual Report (March 28, 2017): https://www.hkexnews.hk/listedco/listconews/sehk/2017/0412/01199_2918149/e123.pdf. *See also* Container News (April 17, 2020): https://container-news.com/florens-sees-upsurge-in-container-demand/; https://www.florens.com/data/FLORENS.pdf (referring to "New Florens," which is the combination of Florens Container Lease and Dong Fang International Investment); Florens Company Overview: https://www.florens.com/func/switch_client_region?client_region=HK#/Florens

[2] COSCO Shipping Development Co., Ltd., 2021 Annual Report (June 9, 2022): https://www1.hkexnews.hk/listedco/listconews/sehk/2022/0609/2022060900379.pdf.

[3] COSCO Shipping Development Co., Ltd., Voluntary Announcement (May 22, 2026): https://www.hkexnews.hk/listedco/listconews/sehk/2026/0522/2026052201594.pdf.

[4] https://www.florens.com/pdf/Notice_to_Public_28042016.pdf

196. COSCO, Dong Fang, and FIL have had overlapping directors which include top executives and managers of the consolidated enterprise. For example, Liu Chong previously served as Executive Director of COSCO, the Chairman of the Board of Dong Fang, and a Director of FIL.[5]

197. In 2020, FIL a/k/a Florens Asset Management Company, formed from the merger of Florens Container Holdings Limited and Dong Fang International Investment, reported "a surge in container orders" and was "making all-out efforts to ensure that no Covid-19-linked factors can cause any disruption."[6]

198. At Intermodal Asia 2026, both Shanghai Universal Logistics Equipment Co., Ltd. (a/k/a Dong Fang) and Florens International Limited (which wholly owns Florens USA) "made a strong joint exhibition appearance," and "comprehensively showcased their latest achievements and overall strengths across dimensions such as technological R&D, intelligent innovation, and green low-carbon development."[7]

199. COSCO, Dong Fang, and Florens USA acted as a single enterprise with unity of purpose in manufacturing and selling Standard Dry Shipping Containers. Among other things, the manufacture, distribution and sale of Standard Dry Shipping Containers was undertaken as part the consolidated operations of the enterprise. Individual participants in cartel meetings and other activities did so with knowledge, authority and for the benefit of the consolidated enterprise. Given this unity of purpose and coordination of activity, there is no realistic possibility that any entity which was part of the consolidated enterprise would sue another or bring claims against it. For example, Florens USA operated as part of the consolidated enterprise and there is no reasonable probability that it would sue either COSCO or Dong Fang.

200. When Plaintiff purchased a shipping container from Defendant Florens USA, Plaintiff was a direct purchaser from a Defendant, co-conspirator, and a subsidiary.

[5] https://www1.hkexnews.hk/listedco/listconews/sehk/2019/0426/ltn201904261143.pdf

[6] Container News (April 17, 2020): https://container-news.com/florens-sees-upsurge-in-container-demand/

[7] http://en.development.coscoshipping.com/col/col5813/art/2026/art_896c0b5e9c084ad09d89c9b459aed02c.html

### 5. Defendants Hold Themselves Out as Single, Integrated Enterprises

201. Even the Defendants and corporate families themselves hold themselves out to the public as single, integrated enterprises, not separate corporate entities. Indeed, they refer to their subsidiaries as "divisions" or "lines" in an otherwise integrated enterprise, which is directed and controlled by the parent.

202. For example, when reporting its financials, COSCO Shipping Development Co., Ltd. reports on the financials of its subsidiaries, including the subsidiaries named herein. Further, the company reports on "its" Standard Dry Shipping Container sales, but many of those sales were actually effectuated or reported by its subsidiary, including the Defendants named herein.

203. COSCO Shipping Development Co. states in its financials, with respect to container manufacturing, that "the Company stood at the forefront and set industry benchmarks. As of now, four of *its* container factories obtained the Level 3 Assessment Certificate of China Manufacturing Maturity Model. DFIC Ningbo was among the first in the industry to receive the national 'Excellence-Level' intelligent factory certification while DFIC Qingdao and DFIC Ningbo were recognized as the 'National 5G Factories.'" (emphasis added). But "its" container factories, as demonstrated by the statement itself, are actually incorporated as "Dong Fang" enterprises.

204. Parent companies strictly control their subsidiaries in this industry. For example, COSCO Shipping Development Co. refers to itself and its subsidiaries as "the Group" and has represented that "The Company will continue to consistently review the corporate governance practices of the Group to ensure that they are *thoroughly* implemented." (emphasis added).

205. The corporate parents dominate and direct the affairs of their subsidiaries. Far from being entirely separate entities, COSCO Shipping Development Co. also represents that "the Board is responsible for managing the businesses and affairs of *the Group* . . . ." (emphasis added). The Board is responsible for "formulating the general strategy and policies of the Group, and establishing corporate and management goals, major operational measures and risk management policies in accordance with the strategic objectives of the Group; supervising and monitoring the operational and financial performance; and approving expenditure budget and

key capital spending, key investments, major acquisitions and disposals of assets, corporate or financial reorganization, major finance consent and management matters." The Board is "responsible for the formulation of corporate governance policies of the Group and the performance of the following corporate governance duties: (1) to formulate and review the Group's policies and practices on corporate governance; (2) to review and monitor the training and continuing professional development of the Directors and senior management; (3) to review and monitor the Group's policies and practices on compliance with legal and regulatory requirements; (4) to formulate, review and monitor the code of conduct of Directors and employees; and (5) to review the Group's compliance with the Corporate Governance Code and disclosures in the Corporate Governance Report."

206. COSCO Shipping Development Co. refers to its subsidiaries collectively as "the Group" and says that "the Group is organised into *business units* based on their products and services and has three reportable operating segments as follows: (a) The container manufacturing business segment, which manufactures and sells containers; (b) The shipping leasing and container leasing business segment, which renders vessel chartering, container leasing and finance lease business; and (c) The investment management business segment, which focuses on equity or debt investments." (emphasis added).

## V. ANTITRUST EFFECTS & DAMAGES

207. Defendants' anticompetitive conduct has had the following effects, among others:

a. Price competition for Standard Dry Shipping Containers has been restrained or eliminated;

b. Prices for Standard Dry Shipping Containers sold by the Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

c. Purchasers of Standard Dry Shipping Containers have been deprived of free and open competition; and

d. Purchasers of Standard Dry Shipping Containers have paid artificially inflated prices.

208. The purpose of Defendants' conduct is to raise, fix, maintain, or stabilize the price of Standard Dry Shipping Containers and, as a direct and foreseeable result, Plaintiff and the proposed Class have paid supracompetitive prices for Standard Dry Shipping Containers during the Class Period.

209. Here, direct purchasers of Standard Dry Shipping Containers were the first to pay supracompetitive prices. Plaintiff's and proposed Class members' overcharges thus resulted directly and proximately from the conspiracy's adverse effects on U.S. domestic and import commerce.

210. Because of the alleged violations of the antitrust laws, Plaintiff and Class Members paid higher prices for Standard Dry Shipping Containers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they suffered damages.

211. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

212. Defendants' price fixing agreement and information exchange are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reasons analysis. Under the *per se* standard, and additionally because there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. Plaintiff nonetheless defines such markets below in case its allegations are ultimately analyzed under a quick look or rule of reason analysis.

## VI. MARKET FACTORS THAT FACILITATED COLLUSION

### A. Relevant Product and Geographic Market

213. To the extent the definition of a relevant product market is legally relevant in this action, the relevant product market is the market for Standard Dry Shipping Containers.

214. Standard Dry Shipping Containers are mutually interchangeable and are distinguished from refrigerated containers and other types of containers that are not ready

substitutes for one another. Standard Dry Shipping Containers that do not provide refrigeration or climate control are not suitable for customers who need or require shipping of refrigerated or climate-controlled goods.

215. Standard Dry Shipping Containers include categories and types of dry shipping containers that have standardized measurements.

216. Standard Dry Shipping Containers are differentiated from refrigerated shipping containers and dry shipping containers that are non-standard in size.

217. To the extent a definition of a relevant geographic market is legally relevant in this action, the geographic market is the United States and its territories. Defendants sell Standard Dry Shipping Containers across the United States and have increased prices for Standard Dry Shipping Containers nationwide.

**B. Manufacturer Defendants Share Market Power.**

218. The Standard Dry Shipping Containers market exhibits hallmark characteristics of markets prone to cartel behavior, including: (1) high market concentration; (2) high barriers to entry; and (3) inelastic demand.

**1. High Market Concentration**

219. A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

220. The Standard Dry Shipping Containers manufacturing market is highly concentrated, with the Defendants producing and selling at least 95% of Standard Dry Shipping Containers in the relevant market. Calculation of market shares and the Herfindahl-Hirschman Index (HHI) show that the market for Standard Dry Shipping Containers is presumptively highly concentrated. As a result, the Standard Dry Shipping Containers market is concentrated, heightening the risk of collusion and other anticompetitive behavior.

221. Defendants control the vast majority of production and sales and thus can more easily monitor one another's conduct, align pricing, allocate territories, and maintain supracompetitive prices over time. The United States Standard Dry Shipping Containers market is highly exposed to the global supply and prices controlled by Defendants.

222. Defendants collectively controlled a high share of worldwide production of Standard Dry Shipping Containers, regularly manufactured and sold substantial quantities of containers for U.S. customers, and knew and intended that substantial quantities of containers affected by their conduct would be sold to and used by purchasers in the United States.

**2. High Barriers to Entry**

223. Under basic economic principles, supracompetitive pricing ordinarily would attract new entrants seeking to capitalize on elevated margins. However, when significant barriers to entry exist, new competitors are far less likely to enter.

224. The Standard Dry Shipping Containers market is characterized by exceptionally high barriers to entry that insulate incumbent manufacturers from competitive pressure.

**3. Demand for Standard Dry Shipping Containers is Inelastic**

225. Demand in the Standard Dry Shipping Containers market is highly inelastic, a condition that economic theory recognizes as making industries especially susceptible to cartel or other anticompetitive behavior. When demand is inelastic, increases in price do not meaningfully reduce the quantity purchased, allowing firms engaged in collusion to raise prices without risking significant loss of sales.

226. Demand for Standard Dry Shipping Containers is inelastic because these containers are indispensable for transporting goods.

227. As a result, buyers like Plaintiff are particularly vulnerable to collusion. Defendants can raise prices with little fear of substitution or reduced demand.

## VII. CLASS ACTION ALLEGATIONS

228. Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of itself and as representative of a class of direct purchasers seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the following Class:

> All persons or entities in the United States and its territories who directly purchased Standard Dry Shipping Containers from any Defendant or Co-Conspirator from November 14, 2019 to the present.

229. Specifically excluded from both the Class are: Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his or her immediate family and judicial staff; any juror assigned to this action; any co-conspirator identified in this action, and persons and entities that paid for the price of transportation, freight, or logistics services in which the cost of Standard Dry Shipping Containers manufactured by one or more Defendants or co-conspirators was included as a component of the price charged for such services, but who did not purchase or acquire ownership of the containers themselves.

230. Plaintiff reserves the right to modify these definitions or to propose subclasses, as appropriate, based on further investigation and discovery.

231. **Numerosity**. Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all members of the Class is impracticable.

232. **Typicality**. Plaintiff's claims are typical of the claims of the Class in that it and members of the Class all purchased Standard Dry Shipping Containers at artificially inflated prices directly from Defendants from Defendants and/or their Co-Conspirators. All members of the Class were damaged by the same wrongful conduct of Defendants and/or their Co-Conspirators, and the relief sought is common to the Class.

233. **Commonality**. Questions of law or fact that arise from Defendants' anticompetitive conduct are common to the Class, including, but not limited to, the following:

a. Whether Defendants engaged in a combination or conspiracy to restrict output and fix, raise, maintain, or stabilize the price of Standard Dry Shipping Containers in the United States;

b. Whether such combination or conspiracy violated Section 1 and 3 of the Sherman Antitrust Act;

c. Whether the conduct of Defendants, as alleged herein, caused injury to Plaintiff and other members of the Class;

d. Whether Defendants' conduct caused prices for Standard Dry Shipping Containers to be artificially inflated during the Class Period.

e. The effect of Defendants' conspiracy on the prices paid by direct purchasers of Standard Dry Shipping Containers sold in the United States during the Class Period;

f. The identity of the participants of the alleged conspiracy;

g. The duration of the conspiracy alleged herein, and the acts performed by Defendants in furtherance of the conspiracy;

h. Whether Defendants fraudulently concealed their misconduct;

i. Whether Defendants' anticompetitive scheme inflated prices of Standard Dry Shipping Containers above competitive levels;

j. The appropriate measure of class-wide damages for the Class; and

k. The nature and scope of the appropriate relief necessary to restore competition in the Standard Dry Shipping Containers market.

234. **Predominance**. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

235. **Adequacy**. Plaintiff will fairly and adequately represent the interests of the Class and have no known conflict with any other members of the Class. Further, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

236. **Superiority**. A class action is superior to individual actions for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Prosecution as a class action will eliminate the possibility of repetitive litigation, and thus costly and duplicative efforts and expenses. In the same vein, proceeding as a class action has the benefit of providing injured persons with a method of obtaining relief for their claims that might not be economically feasible. In addition, the

prosecution of separate actions would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII. FRAUDULENT CONCEALMENT AND TOLLING

237. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct from Plaintiff and Class members. Any applicable statute of limitations has been tolled and suspended by Defendants' knowing and active concealment of their unlawful conduct.

238. Plaintiff and Class members had no actual or constructive knowledge of Defendants' anticompetitive scheme. Plaintiff and the Class did not discover and could not have discovered the existence of the conduct alleged through the exercise of reasonable diligence until shortly before filing this Complaint.

239. Further, the very nature of Defendants' conduct was secret and self-concealing because Defendants hid their conduct through multiple methods, including confidential meetings and secret communications.

240. Defendants took affirmative specific steps to conceal the existence of their cartel and related cartel agreements. This included efforts to ensure that cartel participants did not create or maintain records of their communications as well as efforts to destroy written records of the cartel which may have been created or existed.

241. Defendants also gave pretextual untrue explanations for changes in prices, including the operations of the laws of supply and demand when, in fact, the changes in prices were a result of cartel agreements, including the hidden agreements to restrict output and limit supply.

242. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Defendants' conduct was revealed only through the investigation of the DOJ and the unsealing on May 19, 2026 of the superseding indictment that a Grand Jury issued on January 22, 2026.

## IX. CAUSES OF ACTION

### COUNT I

### Conspiracy to Fix Prices in Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1

243. Plaintiff repeats the foregoing allegations as if fully set forth herein.

244. Beginning no later than November 14, 2019, and continuing through to the present, Defendants entered into and engaged in a continuing contract, combination or conspiracy to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act.

245. The contract, combination or conspiracy consisted of an agreement among Defendants to (1) restrict the manufacturing capacity and output of Standard Dry Shipping Containers sold in the United States; (2) fix, raise, stabilize, or maintain the prices they charged for Standard Dry Shipping Containers in the United States at artificially high levels; and (3) exchange competitively sensitive information, causing anticompetitive effects without sufficient procompetitive justifications.

246. Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition among Defendants has been restrained, suppressed, or eliminated with respect to Standard Dry Shipping Containers;

b. The prices of Standard Dry Shipping Containers have been fixed, stabilized, maintained or increased at artificially high, non-competitive levels throughout the United States;

c. Plaintiff and Class members who purchase Standard Dry Shipping Containers directly from Defendants have been deprived of the benefits of free and open competition between and among Defendants; and

d. Purchasers of Standard Dry Shipping Containers paid artificially inflated prices.

247. This conduct is unlawful under the *per se* standard.

248. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

249. Defendants' production restrictions, price-fixing, and other unlawful actions in furtherance of their conspiracy had direct, substantial, and foreseeable effects on interstate and foreign commerce. Defendants' conduct directly and foreseeably increased prices that purchasers paid for Standard Dry Shipping Containers in the United States.

250. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were injured in their business or property and will continue to be injured in the form of overcharges on Standard Dry Shipping Containers they would not otherwise have paid absent Defendants' conduct. Under Section 4 of the Clayton Act, Plaintiff and the Class are entitled to recover threefold the damages sustained, as well as the costs of suit and reasonable attorneys' fees.

251. Plaintiff and Class members are entitled to equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants' the alleged ongoing violations alleged herein.

## COUNT II

### Unlawful Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 3

252. Plaintiff repeats the foregoing allegations as if fully set forth herein.

253. Beginning no later than November 14, 2019, and continuing through to the present, Defendants engaged in unlawful contracts, combinations, conspiracies, and/or exclusionary conduct affecting the sale of Standard Dry Shipping Containers to direct purchasers in the District of Columbia and any Territory of the United State, or between any such Territory and another Territory, a State, the District of Columbia, or a foreign nation in violation of Section 3 of the Sherman Act, 15 U.S.C. § 3.

254. Defendants restrained trade and/or willfully acquired, maintained, or attempted to acquire monopoly power in the relevant market through exclusive dealing, supply restrictions, or other challenged conduct.

255. Defendants possessed market power or monopoly power in the relevant market, including by reason of their substantial share of sales, control over key inputs or distribution channels, and barriers to entry or expansion.

256. Defendants' conduct harmed competition by raising prices, reducing output or availability, limiting customer choice, excluding or impairing rivals, and preventing direct purchasers from obtaining Standard Dry Shipping Containers at competitive prices.

257. Plaintiff purchased Standard Dry Shipping Containers directly from one or more Defendants or their controlled selling entities during the relevant period. As direct purchasers, Plaintiff paid supracompetitive prices caused by Defendants' unlawful conduct and suffered injury to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein as follows:

A. Determining that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3);

B. Certifying the Class, appointing Plaintiff as Class Representative, appointing Plaintiff's counsel as Class Counsel, and directing that notice of this action be provided to Class members pursuant to Federal Rule of Civil Procedure 23(c)(2);

C. Adjudging and decreeing that the unlawful conduct, conspiracy or combination alleged violated Section 1 of the Sherman Act;

D. Awarding Plaintiff and the Class treble damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest as permitted by law;

E. Awarding equitable, declaratory, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to prevent and restrain Defendants, their affiliates,

successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from (1) continuing, maintaining or renewing the unlawful conduct, conspiracy, or combination alleged herein, (2) entering into any other conspiracy or combination having a similar purpose or effect, (3) adopting or following any practice, plan, program, or device having a similar purpose or effect, or (4) maintaining or renewing the sharing of highly sensitive competitive information to facilitate such a conspiracy;

F. Awarding Plaintiff and the members of the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

G. Awarding any other relief as the case may require and the Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 23, 2026

By: */s/ Joseph R. Saveri*
Joseph R. Saveri

Joseph R. Saveri (SBN 130064)
Diane S. Rice (SBN 118303)
Cadio Zirpoli (SBN 179108)
Christopher K. L. Young (SBN 318371)
Ivy Arai Tabbara (*pro hac vice forthcoming*)*
Regina Wang (SBN 326262)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
drice@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
itabbara@saverilawfirm.com
rwang@saverilawfirm.com

**Located in Washington State*

Joseph W. Cotchett (SBN 36324)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christian S. Ruano (SBN 352012)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & MCCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

*Attorneys for Plaintiff and the Putative Class*